**WATERMAN S. S. CORPORATION v. LAND, Chairman of Maritime Commission, et al.**

No. 8862.

United States Court of Appeals, District of Columbia.

Argued March 20, 1945.

Decided June 18, 1945.

Certiorari Granted Nov. 5, 1945.

ARNOLD, Associate Justice, dissenting.

Mr. Bon Geaslin, of Washington, D. C., with whom Mr. Allen J. Krouse, of Washington, D. C., was on the brief, for appellant.

Mr. Walker Lowry, Attorney, Department of Justice, of San Francisco, Cal., pro hac vice, by special leave of court, with whom Assistant Attorney General, Francis M. Shea, and Messrs. Edward M. Curran, United States Attorney, of Washington, D. C., Arnold Levy, Special Assistant to the Attorney General, and A. Morris Kobrick, Attorney, Department of Justice, of Washington, D. C., were on the brief, for appellees.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

GRONER, C. J.

This is an appeal by Waterman Steamship Corporation, plaintiff below, from a final judgment entered by the District Court dismissing Waterman's complaint for an injunction and declaratory judg-

ment. Waterman is the owner and operator of a large fleet of ocean going steamvessels, and on April 25, 1941, and on several dates subsequent thereto, chartered to British Ministry of War Transport, an agency of the British Government, certain of its vessels for the transportation of war goods from two United States Atlantic Coast ports to two ports of discharge in the Gulf of Aden and the Red Sea. The charter parties covering the several vessels were approved by the Maritime Commission in accordance with § 808 of the Shipping Act of 1916,[1] and were in all respects performed by Waterman, and the charter hire, except in respect to several small items of demurrage, paid to appellant on or before November 28, 1941.[2]

In November, 1943, appellees, constituting the Price Adjustment Board of the Maritime Commission (hereinafter called "Commission"), purporting to act pursuant to the provisions of the Renegotiation Act,[3] served notice upon Waterman to appear before it on December 13, 1943, for the commencement of renegotiation of the charters in question to determine whether Waterman had realized excessive profits.[4]

Waterman, pointing out that the charters were to a foreign government, denied that the Commission had any jurisdiction or authority in relation thereto, and declined to consent to renegotiation. The Commission, however, adhered to its position and insisted that the contracts should be construed to be between *"the vessel owner and the Maritime Commission"* (italics supplied), and hence that the Renegotiation Act was applicable.[5] Waterman, as a result of the impasse, brought this suit June

---

[1] Title 46 U.S.C.A. § 808: "Except as provided in section 1181 of this title, it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, * * * any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, * * *."

[2] The Act, infra note 3, exempts from renegotiation all contracts for which payment was completed prior to April 28, 1942.

[3] 50 U.S.C.A. Appendix § 1191 [§ 403 of the 6th Supplemental National Defense Appropriation Act, 1942, as amended 56 Stat. 982] provides that—"Whenever, in the opinion of the Secretary of a Department," excessive profits are realized "from any contract with such Department," the Secretary may require the contractor "to renegotiate the contract price." The 1943 Act adds to the above a provision authorizing review of the "amount" by the Tax Court and provides that the finding of the Tax Court as to the *amount* of excessive profits shall be final.

[4] The notice to Waterman, fixing the day of the commencement of renegotiation, was captioned as follows:
*Registered Mail—Return Receipt Requested.*
*Subject: Notice of Initial Conference under the Renegotiation Act which shall constitute Commencement of Renegotiation.*

The language of this notice was in the precise language of the Renegotiation Act of 1943 (§ 403 (c) (1)), which reads: "The mailing of such notice by registered mail to the contractor or subcontractor shall constitute the commencement of the renegotiation proceeding." The body of the notice contained, inter alia, the information that "The renegotiation for your company has been assigned to the Commission's Price Adjustment Board," and the time fixed at 10:00 A. M. December 13, 1943, and requested a "detailed breakdown" of voyage revenue, expenses and other income received or expended in re the voyages of the vessels chartered to the British Ministry of War Transport, to the end that the Price Adjustment Board might determine "as to whether you have realized excessive profits, within the meaning of the Act."

[5] The position of the Commission, taken in response to Waterman's written protest that its charter contracts were not renegotiable, was contained in a reply signed by the Commission's General Counsel for *"Price Adjustment Board,"* in which it was said—

"After considerable study of the entire Red Sea Operation, I am satisfied that there was in each case a contract between the vessel owner and the Maritime Commission to which the Renegotiation Act is applicable."

The letter concluded with a statement of the reasons for the opinion and called on Waterman to carry out the Commission's order to submit data to the end that renegotiation might be considered and completed.

The Maritime Commission's Administrative Order No. 64 (issued May 5, 1942)

28, 1944, charging that there exists an actual and immediate controversy between the parties and that accordingly suit is brought for the purpose of enjoining enforcement of the Renegotiation Act as to Waterman's British contracts, and for a judgment declaring that the contracts are not subject to its provisions.

The Commission, without answering, moved to dismiss and the District Court granted the motion on the ground that Myers v. Bethlehem S. Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, is controlling, i. e., *that Waterman had not exhausted its administrative remedies.*

On this appeal Waterman argues *first,* that the charters with the British Ministry were not charters with the Commission, or any "Department" of the United States Government, within the meaning of the Act, and accordingly that there is no law or statute which requires or authorizes their renegotiation; *second,* that final payment was made prior to April 28, 1942, and the charters are accordingly specifically exempted from the provisions of the Act; and *third,* that the charters were completed and terminated in a fiscal year which expired more than one year prior to the date on which appellees purported to commence renegotiation, and hence are excluded from renegotiation by the express provisions of the Act.

If the correctness of the judgment below depended upon answers to Waterman's points two and three, it might perhaps be affirmed, for the questions of the time of payment and completion of contracts may very well be matters as to which Congress has committed the answer primarily to the Commission.[6] But, in the view we take of the first point, we are of opinion that the District Court was wrong in holding against Waterman's legal right to a declaratory judgment on the jurisdictional question. For obviously, if there is no law compelling renegotiation of the contracts here in dispute, and if there is a real and substantial controversy, the question, as the Commission admits, in the present state of the pleadings, is jurisdictional and fundamental and Waterman is clearly entitled to invoke the Declaratory Judgment Act,[7] to the end that the controversy in that regard be settled promptly and without the loss and expense and delay which otherwise is inevitable.

Section 403(c) of the Renegotiation Act, on which the Commission relies, authorizes renegotiation of contracts made with "Departments" of the Government of the United States and provides that notice by registered mail to the contractor or subcontractor, shall constitute the commencement of the renegotiation proceeding. The word "Department" (as to whose contracts, alone, the Commission has jurisdiction) is defined as including "War Department, Navy Department, Treasury Department, Maritime Commission, War Shipping Administration, Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and Rubber Reserve Company, respectively." There is not, and of course there cannot be, any claim that the Commission is authorized to reexamine or renegotiate a contract of a foreign government. And if it is a fact, as the complaint alleges—*and as the motion to dis-*

set up the Price Adjustment Board, and charged it with responsibility to bring about review of a contract as it might deem to be desirable, to renegotiate, or cause to be renegotiated, such contract prices when in its judgment such action might be necessary or desirable. The Administrative Order also authorized the Board to delegate to any one or more of its members the power to initiate investigations, request information and assistance on behalf of the Board and to represent the Board in negotiations with contractors.

[6] With respect to Waterman's third argument, for example, the Act clearly requires an administrative determination in the first instance. Section 403(c) (6) of the 1942 Act provides:

"No renegotiation of the contract price pursuant to any provision therefor, or otherwise, shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, *as determined by the Secretary, occurs.*" (Italics supplied). 50 U.S.C.A.Appendix § 1191(c) (6).

[7] 28 U.S.C.A. § 400. "*Declaratory judgments authorized* * * * (1) In cases of actual controversy (except with respect to Federal taxes) the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such. * * *"

*miss admits*—that the contracts (charter parties) in issue were contracts with the British Government, it follows, of course, that the Commission, in undertaking to investigate profits, is exceeding its statutory powers.

Here, as we have seen, the complaint charges that Waterman, the owner of certain steamships, entered into the charter agreements with the British Ministry of War Transport, an agency of the British Government. And an inspection of a copy of a typical charter party—filed as an exhibit with the complaint—confirms this allegation, for it shows in express terms that it is an agreement "between Waterman Steamship Corporation Owners" and the "British Ministry of War Transport Charterers." And the only thing in the complaint which in any degree connects a Department of the United States Government in any way with the transaction is the statement in allegation 13, as follows:

"The plaintiff is informed and believes and therefore avers that the United States or a department or agency thereof entered into an arrangement, agreement or contract with the British Government or an agency thereof with respect to payments required to be made to the plaintiff by the British Ministry of War Transport, under the form of charter agreements entered into by the plaintiff with the British Ministry of War Transport. The details of said arrangement, agreement or contract are unknown to plaintiff, except as the same are set forth in a letter from the Office for Emergency Management, an agency of the United States, to the British Merchant Shipping Mission, dated the 9th day of June, 1941, a copy of which letter is attached hereto and made a part of this complaint as though fully set forth herein, and marked Exhibit 'E.' The plaintiff was not a party to, nor was it consulted with respect to the arrangement, agreement or contract aforesaid, and took no part in the discussions or negotiations which led to its consummation."

Exhibit "E," referred to, is a letter from the United States Office for Emergency Management to the British Merchant Shipping Mission, as follows:

"The following arrangement with respect to payments required to be made by the British Ministry of War Transport under the form of charter party prepared by the Maritime Commission shall be effected:

"A. The United States Maritime Commission will make the following payments required to be made to the owners or chartered owners by the British Ministry of War Transport under the terms of the charter:

"1. Freight required to be paid under Clause 1 of the charter.

"2. Demurrage, if any, required to be paid under Clause 11 of the charter.

"3. Any increase in charter hire which may become payable under Clause 24 of the charter.

"4. Loading and other expenses payable by the charterer under Clauses 4 and 5 of the charter.

"B. The U. S. Maritime Commission shall receive any payments to be made by the owners or chartered owners pursuant to adjustment or reduction of charter hire under the charter which includes:

"1. Refunds which may be made under Clause 1 of the charter.

"2. Adjustments of freight which may be made under Clause 2 of the charter.

"3. Net amounts which may become payable under Clause 25 and reductions in freight resulting from any reduction in insurance rates under Clause 24 of the charter.

"The foregoing arrangement will be effective on vessels covered by requisition No. 1503A and on all future vessels which sail from U. S. loading ports to the Red Sea until further notice. It is understood, however, that such arrangement will be the subject of further discussion in connection with any changes which may be made in the near future in the charter arrangement.

"Sincerely yours,
"Signed—J. H. Burns
"Major General, U. S. Army."

Giving effect to all that is contained in this correspondence between a bureau of the United States and the British Shipping Mission, it shows no more than an understanding *between the two governments* that the United States would defray the expenses of the delivery from this country to ports on the Red Sea of war supplies to the British. And we may, perhaps, assume that the arrangement was under "Lend-Lease." Perhaps we may also assume that there were obstacles of an international nature which required the adoption of the method followed by the two governments, since at the time of the delivery the United

States were not at war with Germany or Italy. But however that may be, it seems perfectly obvious that such an inter-governmental arrangement could have no effect upon Waterman's legal rights in the charters, and this is especially true in the light of the allegation of the complaint that as to the arrangement Waterman was not consulted and took no part in its consummation. The charter parties were, as we have seen, only between Waterman and the British Ministry, and all of the conditions for the benefit of the charterers were benefits running exclusively to the Ministry. It alone, by the terms of the charters, was authorized to change the named ports of discharge, to make adjustments in charter hire and to receive funds where, under the provisions of the charters, such were payable. The Ministry had the right to cancel the charter party if there were failure in certain aspects of the agreement, and it alone, by the terms of the charters, was responsible for payment of demurrage. If, as claimed by the Commission, the charters were actually agreements between the United States and Waterman, the provisions of the Shipping Act would not have required approval by the Maritime Commission, as it would have of contracts with an alien, and likewise the charter parties, to be legal, must have contained a provision to the effect that no member of or delegate to Congress would share in the profits,[8] and in addition the charters must have contained a provision against discrimination on account of race, color or national origin.[9] So that, at most, we have a case involving a written contract between an American corporation on the one hand and the British Government on the other, in which, for reasons of its own, the United States had assumed, as between itself and the British Government, to act as primary paymaster. Certainly there is nothing in this circumstance, without more, which would set at naught the well established legal principle that those who are parties to and bound by the contract are those who are shown by its terms to have contracted. They alone are bound by its provisions in the absence of a controlling statute.

Counsel for Waterman appropriately cite the case of United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 270, 83 L.Ed. 260, as conclusive of this legal principle. There, in very definitely similar circumstances, the Supreme Court held that the United States, notwithstanding an interest in the subject matter of a contract, could not on that ground be substituted in the place and stead of one of the parties to the contract and be required to assume that party's obligations. As to this the Court said:

"Neither the United States nor any officer purporting to act on its behalf is named a party to the contract. By its terms the contract is declared to be entered into 'between the Superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians, party of the first part' and the Lumber Company, 'party of the second part.' It is thus on its face the contract of the Klamath Indians executed by the Superintendent, acting as their agent. * * *

"Respondents point only to § 7 of the Act of 1910 [25 U.S.C.A. § 407] and the regulations prescribed under it as compelling a different result. They argue that the requirements that the matter of sale be prescribed by the Secretary, that the contracts be executed by the Superintendent and approved by the Secretary, and that the prices of lumber be fixed by the Indian Commissioner, indicate a purpose to make the United States, acting as guardian or trustee of the Indians through the Secretary and Superintendent, the contracting party. But, as we have said, all that was done by the government officials in supervising the execution of the contracts and their performance was consistent with the exercise of its function as protector of the Indians without the assumption by the United States of any obligation to the purchasers of the timber, and no implied obligation on its part arises from the performance of that function."

Here, as we have pointed out, we have a simple contract of carriage by water, entered into by two responsible parties, each in its own behalf, and nothing more—except that the United States as the result of a private arrangement with one of the parties, agreed to, and presumably did, pay the freight.

In this view enough has been said, we think, to indicate that in our opinion the complaint states a cause of action on which the District Court is empowered to enter a declaratory judgment. There is nothing in the Renegotiation Act which forbids it,[10]

---

[8] 41 U.S.C.A. § 22.

[9] 6 Fed.Reg. 3109 (1941).

[10] "These remedies [habeas corpus, certiorari, mandamus, prohibition, and de-

and it is difficult to see how the exercise of the right would improperly interfere with the statutory administrative plan. On the contrary, it would settle the jurisdictional question in the only forum in which it can be settled—at least at this stage of the case. If decided favorably to Waterman, it would completely end the controversy. If decided adversely to Waterman, it would leave the Commission and, if need be the Tax Court, free to consider the merits. They alone are given jurisdiction to determine "what portion of the profits are excessive" within the meaning of the Act.

■ Certainly the power of a federal court, in a case of actual controversy involving no question of administrative discretion, to enter judgment declaratory of the rights of the parties is fundamental where no exclusive remedy is provided by statute—and likewise, even where a remedy of some sort is afforded, if it is not an adequate substitute and does not provide relief.[11] And that is certainly true in this case, for here, as the result of the District Court's disclaimer of jurisdiction, Waterman would be subjected to an expensive inquisitorial investigation. This might be followed by the sequestration of moneys due it by the United States on other contracts; and if these are insufficient in amount, it might then be confronted with an order, based on an *ex parte* determination, requiring it to repay a large sum of money,—all in advance of a decision on the primary question, whether it is liable at all. To grant such a proposition would be contrary to the principles of expeditious justice.

We recognized the wrong of undue delay in judicial review in our opinion in Perkins v. Elg, 69 App.D.C. 175, 99 F.2d 408, 414. The question there was whether a citizen born in the United States who had been taken by her parents as a child to their former home in Sweden, where she remained until after she was twenty-one years of age, was entitled at that time, on her election, to retain American citizenship and to return to the United States as an American citizen. The State Department first answered the question in the affirmative and allowed her to return, but later concluded that the ruling was wrong, threatened her deportation and refused her an American passport, on the ground that because of her return with her father, a naturalized citizen of the United States, to Sweden, his former home, with the intention of not returning, she too had lost her American citizenship and had acquired Swedish nationality. She brought suit against the Secretary of State, Secretary of Labor and the Commissioner of Immigration for judgment declaring that she was a citizen of the United States, and for an injunction against the Secretary of Labor to prevent his carrying out his threat to deport her from the United States. We held that the District Court had jurisdiction to make the declaratory judgment and to enjoin the carrying out of the threat. We said:

"We think the facts we have outlined present a case fairly within the intent and purpose of the act whereby appellee may test the validity of the threat and have, as she is entitled to have, a declaratory judgment of her American citizenship. For we certainly have a case 'admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged,' and in these circumstances the Supreme Court has said the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. Aetna Life Ins. Co. v.

---

claratory judgment] * * * are not limited to the cases in which the Constitution is deemed to require judicial review. On the contrary, even in cases in which Congress is competent to exclude judicial participation, these remedies are available on determination (1) that Congress has not forbidden judicial review, (2) that review would not improperly interfere with administration, and (3) that the issues presented are within the 'judicial power' to decide." Final Report, Attorney General's Committee on Administrative Procedure (1941) 81.

[11] That we have here a "controversy" is beyond any question (see footnotes 4 and 5). That it is subject to judicial decision is also clear, as is also that it is definite and concrete and is between parties having adverse legal interests. It is real and it is substantial. In like circumstances the Supreme Court has said the judicial function may be appropriately exercised, although the determination may not require the award of process or the payment of damages. Aetna Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000.

Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L. Ed. 617, 108 A.L.R. 1000. * * *"[12]

On appeal to the Supreme Court our opinion was affirmed, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320. Here, as there, we have a dispute fundamental in its nature, admitting of an immediate and definitive determination of the rights of the parties. To hold in such a case that the Declaratory Judgment statute is not available would be to destroy the purpose for which it was adopted. Indeed, if it were necessary, as it is not, we might go farther and hold in the present state of facts that the District Court had jurisdiction without regard to the Declaratory Judgment Act to exercise its equity powers to decide the question on which this case turns. See Shields v. Utah Idaho Central Ry., 305 U. S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Utah Fuel Co. v. National Bituminous Coal Commission, 306 U.S. 56, 59 S.Ct. 409, 83 L. Ed. 483, and Great Northern R. Co. v. Merchants Elev. Co., 259 U.S. 285, 290, 42 S. Ct. 477, 66 L.Ed. 943. And the cases on which the Commission relies,[13] and in which a review in equity was denied, were based upon the fact that there were adequate statutory remedies otherwise available. Here there is none, for the Renegotiation Act affords no opportunity, either before the Commission or the Tax Court or elsewhere, for an adequate determination of the jurisdictional question. And in such case Professor Borchard says "it is a matter for judicial determination."[14] And to this he adds that "where administrative authority over a particular transaction or business is in dispute, and, the facts being established, the issue of jurisdiction is purely one of law, there is no reason why the courts cannot make a declaration, although in some of these cases an injunction would be refused."[15]

Accordingly we refrain from concluding that a temporary injunction issue,[16] though the *status quo* may, in the discretion of the District Court, be maintained pending decision of the jurisdictional question. In such case, the District Court may, as a condition thereof, require appellant to execute and file an indemnity bond, with proper sureties, in such sum as will insure payment to the United States of any amount ultimately found to be due the United States, growing out of the contract or contracts involved in this litigation.

We therefore remand the case to the District Court for consideration of the single question: Were the charter agreements, entered into in 1941 by Waterman Steamship Corporation and the British Ministry of War Transport, contracts with

---

[12] Cf. Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938.

[13] Particular emphasis is placed upon the following four cases, which we think are distinguishable:

(1) California v. Latimer, 1938, 305 U. S. 255, 59 S.Ct. 166, 83 L.Ed. 159, held that an original bill in equity would not lie where the administrative tribunal's orders could only be enforced at law, at which time petitioner might then present its jurisdictional defenses;

(2) Federal Power Commission v. Edison Co., 1938, 304 U.S. 375, 58 S.Ct. 963, 968, 82 L.Ed. 1408, held that "mere preliminary or procedural orders are not within the statutes providing for *review by the Circuit Court of Appeals*." (Italics supplied);

(3) Petroleum Exploration, Inc., v. Public Service Commission, 1938, 304 U.S. 209, 58 S.Ct. 834, 82 L.Ed. 1294, held that the mere cost of preparing for a hearing is not sufficient cause to justify the interference by a *federal* court with a *state* administrative body; and

(4) Myers v. Bethlehem Shipbuilding Corporation, 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, held that the statute had vested *exclusive* jurisdiction in the Circuit Court of Appeals to set aside, upon petition by an aggrieved party, any final order of the administrative body, and that the administrative remedies before the Board and the Court must first be exhausted before recourse could be had to a court of general equity jurisdiction.

Miles Laboratories v. Federal Trade Comm., 78 U.S.App.D.C. 326, 140 F.2d 683, is also cited by appellees. But there we dealt with a nonjurisdictional attack on an administrative body, from whose orders there existed an exclusive statutory right of appeal.

[14] Borchard, Declaratory Judgments (2d Ed.1941) 878.

[15] Ibid.

[16] Cf. Interstate Natural Gas Co. v. Louisiana Pub. Service Comm., D.C.E.D.La., 1940, 33 F.Supp. 50 (preliminary injunction denied)—D.C., 34 F.Supp. 980 (declaratory judgment granted); Black v. Little, D.C.E.D.Mich., 1934, 8 F.Supp. 867. And see New York & Porto Rico S. S. Co. v. United States, D.C., 32 F.Supp. 538, 2 Cir., 116 F.2d 799, reversed, D.C., 36 F.Supp. 190.

a "Department" within the meaning of § 403 of the Renegotiation Act of 1942?

Reversed and remanded for proceedings in accordance with this opinion.

ARNOLD, Associate Justice (dissenting).

The majority opinion is in direct conflict with the well settled principle which this court affirmed in the case of Helco Products Co. v. McNutt,[1] as follows:

"The Supreme Court has said the pronouncements, policies, and programs of a government administrative agency do not give rise to a justiciable controversy, save as they have fruition in action of a definite and concrete character, constituting an actual or threatened interference with the rights of persons complaining. To permit suits for declaratory judgments upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions to the average citizen than any possible gain which could accrue."

It appears from the complaint and exhibits attached that the Chief Counsel of the Price Adjustment Board of the Maritime Commission has informed appellant that certain of its contracts are subject to the Renegotiation Act.[2] Appellant is in disagreement with the Chief Counsel. It has declined to discuss the matter with the Board or to give it any information. Instead it brings this action asking the court below to review the opinion of the Chief Counsel of the Board.

The judgment of the court below dismissing the complaint is clearly correct. There is no case or controversy before the court.[3] No administrative agency has made a decision of any kind which can be reviewed. The Price Adjustment Board before whom the appellant has been requested to appear has taken no action and made no recommendation.[4] But even if the Board had acted its decision would be only advisory. The Act authorizes the Chairman to delegate his authority by regulation.[5] But he has done so only to a limited extent. He has given the Price Adjustment Board the authority only to make a preliminary determination of the proper contract price. No action to enforce that decision may be taken unless the Chairman by his order follows the recommendation of the Board.[6]

No right of appellant is prejudiced by the dismissal of this premature complaint. If the Chairman of the Commission unlawfully determines to withhold any sums due to appellant, appellant has its remedy by a suit on the contract. If the Chairman of the Commission decides to sue appellant for excess profits appellant may defend on the ground that the Chairman acted beyond his statutory authority. If the Chairman decides to compel appellant to furnish information on these contracts he must use a subpoena which can only be enforced by

---

[1] 1943, 78 U.S.App.D.C. 71, 73, 74, 137 F.2d 681, 683, 149 A.L.R. 345. See also Miles Laboratories v. Federal Trade Comm., 1944, 78 U.S.App.D.C. 326, 140 F.2d 683; Nat'l. War Labor Board v. Montgomery Ward & Co., 1944, 79 U.S. App.D.C. 200, 144 F.2d 528; certiorari denied 65 S.Ct. 134.

[2] In this letter the Chief Counsel stated: "Pursuant to this direction, the Commission negotiated with the vessel owners. The vessels were made available, a charter party was signed with the British Ministry of War Transport for technical reasons but the Commission agreed to pay the vessel owner the agreed compensation for the use of the vessel. *This arrangement was evidenced by correspondence between the Commission and the vessel owner.* There appears to have been mutuality of understanding among all the parties interested, legality of consideration and definiteness as to terms, time of performance and acceptance. Payment was made in due course as agreed and this payment constitutes a part of the cost of the war to the people of the United States." [Emphasis supplied.]

[3] Myers v. Bethlehem Shipbuilding Corporation, 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638. This court stated in Doehler Metal Furn. Co. v. Warren, 1942, 76 U.S.App.D.C. 60, 62, 129 F.2d 43, 45: "The declaratory judgment Act, however, does not increase the jurisdiction of the federal courts, in the sense that, if a court has not had power over certain subject matter or over certain persons, the declaratory judgment Statute does not give it."

[4] The official notice of the Board concerning an initial conference contains the following:

"You are at liberty at the initial conference to submit reasons why you cannot furnish the information within the requested period, *as well as to state reasons why you are not subject to renegotiation.*" [Emphasis supplied.]

[5] Renegotiation Act of 1942, 56 Stat. 982, § 403 (f).

[6] Administrative Order No. 64.

court proceedings in which appellant may make this same defense.[7]

Appellant's claim that it may be subject to criminal prosecution is equally insubstantial. A criminal prosecution requires first a formal order issued by the Chairman, second a wilful failure to comply with it.[8] No such order has been issued or threatened. Even if such order had been issued a court of equity would not interfere. Failure to obey the order based on a reasonable belief it was unlawful would not subject appellant to penalty for wilful disobedience.[9]

The effect of the majority's decision will be to permit any party who is asked to renegotiate a contract to bring an immediate suit in court by alleging that his particular contract is not subject to the Act. On the filing of such a bill the renegotiation conferences must stop while the District Court makes an initial determination of the jurisdiction of the administrative agency.[10] It is naive to think that this device will not be used for purposes of delay.

Nothing in the Act or in the principles of orderly administrative procedure justifies intermeddling by this court in the complex business of renegotiation in absence of an order affecting appellant's rights.

[7] Cf. Elliott v. American Mfg. Co., 5 Cir., 1943, 138 F.2d 678, 679.

[8] The only request for information comes from the Price Adjustment Board. The Act requires as a basis for criminal prosecution an order from the Secretary of the Department involved which in this case means the Chairman of the Maritime Commission. See Sections 403 (e) and 403 (a) (2), supra note 5.

[9] California v. Latimer, 1938, 305 U.S. 255, 260, 261, 59 S.Ct. 166, 83 L.Ed. 159.

[10] Compare the language in Great Lakes D. & D. Co. v. Huffman, 1943, 319 U.S. 293, 299, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407:

"It is true that the Act of Congress speaks only of suits 'to enjoin, suspend, or restrain the assessment, levy, or collection of any tax' imposed by state law, and that the declaratory judgment procedure may be, and in this case was, used only to procure a determination of the rights of the parties, without an injunction or other coercive relief. It is also true that that procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended."