231 F.2d 754
 98 U.S.App.D.C. 1, 56-1 USTC P 9311
 The UNITED STATES of America and The Secretary of Commerce,
as Successor to the Chairman of the United States
Maritime Commission, Petitioners,
v.
CALIFORNIA EASTERN LINE, Inc., Respondent.
 No. 11448.
 United States Court of Appeals District of Columbia Circuit.
 Argued on Remand from Supreme Court, may 18, 1955.
Decided Feb. 16, 1956.
 
 Mr. Frederick N. Curley, Atty., Dept. of Justice, with whom Mr. Edward H. Hickey, Atty., Dept. of Justice, was on the brief, for petitioners.
 Mr. Samuel D. Slade, Atty., Dept. of Justice, also entered an appearance for petitioners.
 Mr. Robert E. Kline, Jr., Washington, D.C., for respondent.
 Before PRETTYMAN, WASHINGTON and DANAHER, Circuit Judges.
 DANAHER, Circuit Judge.
 
 
 1
 The controversy here presented arose under the Renegotiation Act, as amended.[1] The Tax Court by its decision [98 U.S.App.D.C. 2] and order of February 26, 1952, ruled that there was presented no renegotiable contract within § 403(c)(1). See 1952, 17 T.C. 1325. When the Government filed its petition for review, we were first confronted with a jurisdictional question because of lack of the proper parties. See 1953, 92 U.S.App.D.C. 207, 204 F.2d 398. When next before us, we dismissed the petition for review for lack of jurisdiction, for reasons stated in 1954, 93 U.S.App.D.C. 289, 211 F.2d 635. Rehearing en banc by this court having been denied, certiorari was granted, 1954, 348 U.S. 810, 75 S.Ct. 59, 99 L.Ed. 639, and the Court thereafter held that 'the Tax Court's decision in this case is * * * subject to the normal type of review authorized by § 1141.' United States v. California Eastern Line, 1955, 348 U.S. 351, 355, 75 S.Ct. 419, 422, 99 L.Ed. 383. It thereupon became our duty to review the Tax Court's determination, and in doing so we have proceeded 'in the same manner and to the same extent as (with) decisions of the district courts in civil actions tried without a jury'.[2]
 
 
 2
 Since, from the various opinions cited the facts appear in sufficient detail, we present only such background as is required to highlight the basic problem. In 1941 the Maritime Commission assembled some 2,000,000 tons of merchant shipping, including an intercoastal ship VERMONT owned by California Eastern Line, Inc. The Commission negotiated the terms of a charter between the owner and the British Ministry of War pursuant to which the VERMONT sailed for a Red Sea port with supplies for use in the African campaign. After the VERMONT'S departure, May 29, 1941, the charter was formally signed by the owner and by a representative of the British Ministry of War and expressly ran between the signatories. The Government claims that the British acted on behalf of and as agent for the Maritime Commission, but the Tax Court specifically found to the contrary and upheld the owner's contention in this respect. The Commission, from Lend-lease funds appropriated by the Congress for the purpose, paid the owner about $351,000 as charter hire, of which the amount of $164,000 was later determined by the Maritime Commission to be 'excessive profits,' said to be subject to renegotiation. The shipowner thereupon petitioned the Tax Court for relief, asserting that the charter was not subject to renegotiation, because (a) it was not made with the Maritime Commission, but with Great Britain;[3] (b) 'final' payment under the charter was made June 23, 1941, hence the Act of April 28, 1942, could not apply;[4] and (c) the renegotiation was commenced more than one year after the close of the contractor's fiscal year within which the contract had been completed.[5]
 
 Judge Raum's able opinion concluded:
 
 3
 'Respondent's contention, that the British Ministry acted as the Commission's agent and that the Commission was the charterer of the Vermont, is based on the facts that the Commission negotiated the terms and form of the charter, exercised supervision over performance under the charter, and, in behalf of the United States Government, furnished the funds and controlled payment under the charter. We think it does not necessarily follow, under the Renegotiation Act, that these circumstances stamped the charter as being a contract with the Commission. The question of fact remained whether on the entire evidence the charter was such a contract. As the repository of these very important powers, the Commission might have chosen in some circumstances to charter the Vermont [98 U.S.App.D.C. 3] itself, making all other arrangements substantially the same as it did here, and to undertake transportation of the British cargo to the destinations at which it was required. Whatever the reasons may have been, whether because of lack of authority or because of restrictions on its action which exigencies of the international situation then imposed on the United States as a non-belligerent, the fact is that the Commission avoided selection of this course. It chose rather that in which the British Ministry was the charterer and in which the contract was with the British Ministry; to itself the Commission relegated the function of making the arrangement and tending to other matters in a way which would make it possible for the British Ministry to charter the Vermont. The contract in fact was, and was intended to be, with the British Ministry and not with the Commission. Cf. Waterman S.S. Corporation v. Land, (80 U.S.App.D.C. 167) 151 F.2d 292, 293-296, reversed on other grounds, sub. nom. Macauley v. Waterman S.S. Corp., 327 U.S. 540 (66 S.Ct. 712, 90 L.Ed. 839) * * *.' 1952, 17 T.C. 1325, 1341-1342.
 
 The Government in its brief says:
 
 4
 'In this Court, the questions presented are: (1) Whether the Tax Court erred in excluding certain evidence offered by petitioners in support of their defense, and (2) whether the holding by the Tax Court that the contract in question was not a contract with the Commission within the meaning of Section 403(c)(1) of the Renegotiation Act was warranted by and consistent with the subsidiary findings of fact made by that court. No question is raised as to the validity of any of the subsidiary findings of fact, most of which were based on stipulated facts.'
 
 
 5
 Because of the earnest insistence by the Government that the Tax Court's findings must fall, we have carefully examined the entire record and the scores of exhibits included. Not only do we conclude that there has been demonstrated no error affecting substantial rights, but on the same record, we would in all probability have arrived at the same result as did the Tax Court. The Government seems really to have been persuaded by its firm conviction that the profits were in fact excessive and should have been recaptured, at least to the extent of $164,000. Such a view is understandable, yet, from the very outset the Commission must have known exactly what its cost problem was. Its May 23, 1941, minutes disclose its plan
 
 
 6
 '* * * for the execution of a space charter between the vessel owners and the British Ministry of War Transport. A copy of the proposed form of charter is attached. It provides that the owner of the vessel will receive 75cents per cubic foot on the total bale cargo capacity of his vessel and, if any cargo is carried on deck, 60cents per cubic foot on actual measurement of such cargo. * * * For example, on a vessel with 400,000 cubic feet of bale cargo space and no cargo carried on deck, the vessel owner will be paid $300,000 for the voyage to Suez * * *.'
 
 
 7
 The space charter of the very craft here involved called for a payment of the full sum of $336,577, which was made June 23, 1941, as the Tax Court found.
 
 
 8
 No one then was asking Congress to authorize the rewriting of charter-hire or, in the alternative, the requisitioning of the vessels whose owners might refuse to risk their loss in Red Sea wartime voyages or to accept disruption of their own service to their own loss. Replacements for ships lost were hard to find and costs were high. The movement of vast quantities of explosives was involved. The extent of the hazard was unknown. Shipping was at a premium, [98 U.S.App.D.C. 4] indeed commercial rates at the time amounted to $1. or more per cubic foot. Every vessel could profitably be employed in neutral waters without the possibility of need for repairs at some distant port unequipped to deal with emergency conditions. What, if any, return cargoes could be picked up was uncertain. Above all, the urgent need in 1941 for expedited delivery of war supplies commanded arrangements which in different and later stages of the war were otherwise to be scrutinized and better controlled. But in May 1941, the plain and well realized fact was that the Commission had no effective legal control over space charter rates. Congress conferred no power over charter rates generally until long after the vessel had sailed and delivered her cargo.
 
 
 9
 Even when the Renegotiation Act was first considered as § 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, Congress did not seek retroactively to reach excessive profits paid for supplies sold or transportation service rendered to the nations with which we later were allied. Nor did the Commission, possessed of the facts, seek such authority, indeed its minutes for November 19, 1942, disclose the Chairman had called a conference with the owners of various 'Red Sea' vessels to seek a voluntary rebate plan.
 
 
 10
 'From our investigation,' he said 'we now are convinced that the rates were too high, and exceedingly so, and it is my feeling that the various steamship owners should voluntarily make a refund, thereby remedying the situation. If that is not done, no doubt the Comptroller General will report the results to the Congress, and you may be assured that we will be confronted with an investigation by some committee, with results which, in my opinion, will be injurious to the American merchant marine.'
 
 
 11
 In this case, not until November 27, 1943, was an effort made to set in motion the renegotiation procedures. Not until 1949 was a 'determination' made.
 
 
 12
 By letter of March 22, 1943, the Chairman reported to Congressman Hart, Chairman, Special Subcommittee on Charter Rates, House Committee on the Merchant Marine and Fisheries:
 
 
 13
 'The Commission did not pay the charter hire, in this instance or others, at the time under discussion. It approved the rates to be paid. In obtaining the use of ships on a voluntary basis, the Commission undertook to correlate and direct traffic. Charters were made between the shippers and the owners. * * * In the case of the Red Sea voyages, the ships were chartered by their owners to the British Ministry of War Transport. The charter hire was paid out of lend-lease funds allocated for the purpose, presumably on account of the problem of exchange involved.'
 
 
 14
 As of March 29, 1943, referring to correspondence 'relating to certain space charters between the British Ministry of War Transport and American owners of vessels for carriage of lendlease material to the Red Sea,' the Chairman informed the Comptroller General's Office that Commission counsel had 'advised that the application of the renegotiation statute was doubtful (1) as to all of the charters because the United States was not a party thereto, and (2) as to those charters on which final payments had been made prior to the enactment of the renegotiation act.'
 
 
 15
 And so the record goes, overwhelming the suggestion that the British Ministry of War Transport was the agent in any capacity for the Government of the United States or for any of the Departments enumerated in the statute.
 
 
 16
 But, the Government now says, despite what the terms of the charter were, and irrespective of the Commission's own understanding of the transaction, the Tax Court's findings and conclusions must be reversed because of the British Government's view as to [98 U.S.App.D.C. 5] its understanding of the relationship which prevailed in 1941.
 
 
 17
 This understanding, it is argued, is to be discerned from a 'statement' which was excluded by the Tax Court. Calling attention to the pendency of this case which 'will be the lead case in a series,' the Department of Justice asked the Department of State to procure from the British Government an official 'statement' as to the relationship 'between the United States Government and the British Government' at the time the charters were executed. In due course, back through channels came a certificate which reads:
 
 
 18
 'I, Frederick Victor Cross, an Assistant Secretary of the Ministry of Transport, HEREBY CERTIFY that the document hereto attached and marked 'A' is a STATEMENT based on Information extracted from documents preserved in the archives of the Ministry of Transport (formerly the Ministry of War Transport); and that to the best of my knowledge and belief, it is a TRUE STATEMENT.
 
 
 19
 'F. V. CROSS.
 
 
 20
 '18th January, 1951.
 
 
 21
 'Ministry of Transport,
 
 
 22
 'Berkeley Square House,
 
 
 23
 'London, W. 1.'
 
 
 24
 The attached statement appears in the margin.[6]
 
 
 25
 While it is true that the document was excluded, it is equally clear that the Tax Court carefully considered the claims of the respective parties with reference to it. We previously had occasion to note that the Tax Court after examination of the statement concluded: 'that even upon that basis the Government did not establish its point.'[7]
 
 
 26
 Government counsel, steadfast as ever throughout this prolonged litigation, zealously argued to us that the Tax Court was legally bound to admit as [98 U.S.App.D.C. 6] evidence the 'official statement' of the British Government and thereupon to accept, as proved from that statement, such purported facts as would establish that the British Ministry of War Transport acted as the agent of the Maritime Commission. It would then follow-- counsel say-- that the charter did not run between the named parties, but was in fact a contract between the shipowner and the Maritime Commission.[8]
 
 
 27
 Thus the Tax Court's decision would be caused to depend upon the conclusions drawn in 1951 from unidentified documents in British archives, by some Assistant Secretary of the Ministry of Transport, with no showing as to his competence so to act, if he personally did act, and with no identification as to who compiled the 'statement' if it were not Mr. Cross. An 'Acting Assistant Attorney General,' while this case was pending, asked that the British authorities supply the 'statement' for use as evidence here. It was described as 'vitally important' to the Government's position. Yet our Government must have had access to all Maritime Commission files as well as to other official American departmental files. It surely could have called as witnesses Admiral Land, former Commission chairman, and various other officials who, in the day and time of the transaction, had firsthand knowledge of all pertinent facts. Despite the availability of American sources, to accord to the proffered evidence any such force as is now sought for it would do violence to the understanding of many as to the basis for a 'public document' exception to the hearsay rule. The Government cites as authority such cases, among others, as Ex parte State of New York, 1921, 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063; Agency of Canadian Car & Foundry Co. v. American Can Co., D.C.S.D.N.Y.1918, 253 F. 152 and Culbertson v. H. Witbeck Co., 1888, 127 U.S. 326, 8 S.Ct. 1136, 32 L.Ed. 134.
 
 
 28
 The Tax Court considered the document and commented thus:
 
 
 29
 'Nowhere in the certificate of the Assistant Secretary of the Ministry of Transport is there any representation that the attached document represents the official views of the British Government; he certifies merely that the statement is 'based on information extracted from documents preserved in the archives of the Ministry of Transport', and that to the best of his knowledge and belief it is a true statement. The statement itself does not appear to be an official record, nor is it an official statement of the views of the British Government. It merely incorporates information said to be collected by some unidentified person, and said to have been 'extracted' from unidentified and undescribed documents. There are here none of the safeguards in the presence of which the hazards of hearsay evidence and of the absence of cross-examination are risked. Contrary to respondent's contention, Exhibit G does not satisfy the conditions under which official statements are admitted in exception to the hearsay rule. Cf. Gilbert v. Gulf Oil Corp. (4 Cir.), 175 F.2d 705, 710; United States v. Grayson (2 Cir.), 166 F.2d 863, 868-869; Franklin v. Skelly Oil Co. (10 Cir.), 141 F.2d 568, 572, 153 A.L.R. 156; Von Zedtwitz v. Sutherland (58 App.D.C. 153), 26 F.2d 525, 526; Guettler v. Alfsen (53 App.D.C. 215), 289 F. 613, 614. We point out, furthermore, that even if Exhibits G and H were admitted, they would not, taken together with all the other evidence, cause us to change any of our conclusions as to the facts as we have found them. Even in the presence of these exhibits, which reflect at best only the 'view' or 'understanding' [98 U.S.App.D.C. 7] of certain unidentified persons, the evidence in its entirety establishes to our satisfaction that in fact the British Ministry neither acted nor was intended by the Commission to act as the Commission's agent in entering into the Vermont charter, and that the charter was not with the Commission.' 1952, 17 T.C. 1325, 1340-1341.
 
 
 30
 We need not rule directly upon the admissibility of the document or decide that it shall have 'the force of proof'[9] or that it is any more than a statement of the contentions of the Government as a litigant. It certainly is not offered by the British Government in its own behalf. We regard it as immaterial in the light of the whole record, the facts as stipulated, and the exhibits. Whether the British Government held the view or 'understood' that we should earlier have entered the war, or that the United States was transporting for its own account war goods purchased by Great Britain for use by the latter in the African campaign, or that its Ministry of War Transport was acting as our Government's agent for the accomplishment of our nation's objectives is beside the point. That we had a purpose is well known. Our own Government took careful, planned and cautious steps to carry on this transaction for the benefit 'of the democracies,' as President Roosevelt said in his April 30, 1941, letter to the Commission. The whole operation was "' part of the defense effort to which this country is committed"'.[10] For reasons deemed valid by the Executive, means were then adopted to make certain that at the bar of history, the United States would not appear as a belligerent, or as committing an act of war or as offering, under American auspices, a target to the aggressor. The measures were designed to protect our status, and the Commission saw to it that the documents reflected that status. That they were sufficient, as the Tax Court concluded, we agree.
 
 
 31
 Thus, it has not been shown that the Tax Court's findings are clearly erroneous, or that its conclusions lack substantial support in the record. Such a result is in harmony with the Congressional purpose as stated in the Renegotiation Act, quite apart from the changed circumstances after our entrance into the war and the more expanded controls which followed.
 
 
 32
 The contract was not subject to renegotiation as one made with the Maritime Commission, or as a subcontract thereunder. Moreover, the Tax Court found that there was a 'full payment' on June 23, 1941; whether it was 'final' so as to be beyond renegotiation since made prior to April 28, 1942, was not decided, but had it been, a substantial basis for a conclusion of finality can be discerned. We make no comment on the date of commencement of proceedings in relation to the petitioner's fiscal year. We have said enough to indicate why, in our judgment, this litigation has had its day.
 
 
 33
 Affirmed.
 
 
 
 [1]
 Act of April 28, 1942, 56 Stat. 245, as amended, 50 U.S.C.A.App. § 1191
 
 
 [2]
 26 U.S.C. § 1141(a) (1952); Lichter v. United States, 1955, 95 U.S.App.D.C. 316, 221 F.2d 869, certiorari denied, 350 U.S. 822, 76 S.Ct. 49
 
 
 [3]
 § 403(c)(1) of the Renegotiation Act of 1942, note 1 supra
 
 
 [4]
 Id. § 403(c)(6)
 
 
 [5]
 Id. § 403(c)(3)
 
 
 [6]
 'Statement by His Majesty's Government as to the circumstances under which certain American vessels were made available for the carriage of war supplies to the Red Sea Area in 1941
 '1. His Majesty's Government, early in 1941, requested the United States Government, and the United States Government agreed, to furnish certain shipping tonnage necessary to the prosecution of the War in which His Majesty's Government was then engaged. The United States Government agreed to furnish such tonnage at its own expense and no arrangement for reimbursement by His Majesty's Government has been, or will be, made.
 '2. Such tonnage was, during 1941 and 1942, furnished by means of certain charters with various shipowners covering voyages to Red Sea ports, commonly referred to as 'Red Sea Charters', a list of which is attached hereto.
 '3. His Majesty's Government took no part in the negotiations with the shipowners leading up to the execution of said charters.
 '4. At the request of the United States Government, the British Ministry of War Transport, a representative of His Majesty's Government, signed the charters as negotiated and drafted by the United States Maritime Commission and the shipowners. The signature by the representative of His Majesty's Government was requested by the United States Government on the ground that it was necessary to meet formal requirements. No. charters were in fact executed by the representative of His Majesty's Government until after the receipt of a letter dated June 9, 1941, from the Office for Emergency Management to the effect that the obligations of the charters would be met by the United States Maritime Commission on behalf of the United States Government.
 '5. When the representative of His Majesty's Government signed the above-mentioned charters, it was understood that His Majesty's Government in signing said charters were agents only and that the principal and real party in interest was the United States Government as represented by the United States Maritime Commission.
 '6. The bills submitted by the shipowners under said charters to His Majesty's Government were forwarded to the United States Maritime Commission for payment. In forwarding such bills, the representatives of His Majesty's Government certified merely that the services specified had been performed.'
 
 
 [7]
 United States v. California Eastern Line, 1954, 93 U.S.App.D.C. 289, 211 F.2d 635, note 13
 
 
 [8]
 Compare the analysis by Chief Judge Groner in Waterman S.S. Corporation v. Land, 1945, 80 U.S.App.D.C. 167, 151 F.2d 292, reversed on a jurisdictional point, Macauley v. Waterman S.S. Corp., 1946, 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839
 
 
 [9]
 Compania Espanola De Navegacion Maritima, S.A. v. The Navemar, 1938, 303 U.S. 68, 75, 58 S.Ct. 432, 82 L.Ed. 667; cf. Von Zedtwitz v. Sutherland, 1928, 58 App.D.C. 153, 154, 26 F.2d 525
 
 
 [10]
 Macauley v. Waterman S.S. Corp., 1946, 327 U.S. 540, 542 note 2, 66 S.Ct. 712, 713, 90 L.Ed. 839