CALIFORNIA EASTERN LINE, INC., PETITIONER, *v.* CHAIRMAN OF THE UNITED STATES MARITIME COMMISSION, RESPONDENT.

Docket No. 870-R.   Promulgated February 15, 1952.

*Harold B. Finn, Esq.*, and *Robert E. Kline, Jr., Esq.*, for the petitioner.

*Frederick N. Curley, Esq.*, and *James H. Prentice, Esq.*, for the respondent.

1328

## OPINION.

Raum, *Judge:* The Renegotiation Act, as amended,[3] sought to limit exploitation of the defense effort for private enrichment by directing renegotiation of certain war contracts in order to eliminate "excessive profits." Power to renegotiate was conferred on specified "Department" heads, to whom the Act referred as "Secretaries," but such power was exercisable only with respect to a "contract with such Department or * * * any subcontract thereunder." Sec. 403 (c) (1).[4] Commencement of renegotiation was forbidden "more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs." Sec. 403 (c) (6). And the Act was made inoperative where "final payment pursuant to such contract or subcontract was made prior to April 28, 1942," the effective date of the Act. Sec. 403 (c) (6) (i).

Petitioner entered into a contract which grew out of the needs of the national emergency in 1941, and respondent, having found that excessive profits were realized on it, seeks their recapture under the Renegotiation Act. Congress authorized renegotiation, however, only where the restrictions it imposed in the Act were satisfied, and it is not enough under the Congressional mandate that, in a general way, excessive profits on a war contract may have been earned and ought to be recovered. The specific conditions imposed by the Act for renegotiation must be met, or else the Act is inapplicable and power to renegotiate is lacking. It is just such an absence of power that petitioner insists characterized respondent's action in this case, asserting that its contract was not "with such Department" but with the government of a foreign country, Great Britain; that "final payment" was made prior to April 28, 1942; and that renegotiation was not commenced within the period limited in the statute after "completion" of the contract.

The contract in its terms supports petitioner's position on the first of these issues, in that it purports to be a contract only between peti-

---

[3] As pointed out in footnote 1, *supra,* the Renegotiation Act was first enacted as sec. 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, 56 Stat. 245, 50 U. S. C. App., sec. 1191. It was amended by section 801 of the Revenue Act of 1942, 56 Stat. 982; section 1 of the Military Appropriation Act, 1944, 57 Stat. 347–8; Public Law 149, 78th Cong., 1st sess., 57 Stat. 564; and section 701 of the Revenue Act of 1943, 58 Stat. 78.

[4] Although some of the amendments made by the Revenue Act of 1943 were retroactive, the applicable provisions herein were left unaffected in relation to cases controlled by exis ing statute prior to such amendments. Those provisions are found in section 403 (c), quoted above, as well as in section 403 (a). Section 403 (a) (1) defined "Department" to mean "the War Department, the Navy Department, the Treasury, the Maritime Commission, Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation and Rubber Reserve Company, respectively"; and section 403 (a) (2) defined "Secretary," in the case of the Maritime Commission, to mean "the Chairman of such Commission."

tioner and an agency of the British Government. Respondent's reply is that in this matter the British Government acted as the agent of the United States Maritime Commission (to which we refer as the "Commission") ; that petitioner's contract was therefore with the Commission; and, since the Commission was one of the "Departments" named in the Act, that the contract was renegotiable. The weight of the evidence, however, requires us to reject respondent's premise that the British Government acted as the Commission's agent, and to conclude that the contract was not with the Commission. Accordingly, since it follows that the contract was not subject to renegotiation under the Act, it becomes unnecessary to consider the two remaining objections raised by petitioner.

The factual background of the contract may be briefly stated. In 1941, in accordance with a program for strengthening the position of the United States and other democracies, Congress enacted the so-called Lend-Lease Act (55 Stat. 31, 22 U. S. C. sec. 411) and the President directed the Commission to build up a shipping pool to be used for defense purposes. The British Government had been acquiring war equipment in the United States but lacked the necessary shipping facilities to transport it, particularly to the Red Sea area for use in the North African theatre. Accordingly, the British authorities requested the United States to furnish such shipping facilities under the Lend-Lease program, and so long as the necessary shipping was provided, and the British Government was not burdened with payment therefor, the British authorities do not appear to have cared through what arrangements those facilities were furnished. The British request being granted, the task of collecting and making available the required shipping naturally fell to the Commission.

Commission officials summoned and negotiated with various shipowners including petitioner, which owned a steamship named the "Vermont." The officials and the owners, including petitioner, came to an agreement on the terms on which their ships would be provided for the operation to the Red Sea, the agreement being in the form of a space charter [5] or contract of carriage by water between the owners and the British Ministry of War Transport, an agency of the British Government, as charterer. The charter, reduced to writing in the agreed form, was then submitted to the Commission for its approval, which was granted subject to certain modifications and conditions, and, in the form approved by the Commission, a charter for the Ver-

---

[5] A "space charter," where the charterer generally pays on the basis of space provided for the shipment of his cargo and where the vessel remains under the operating control of the owner, is to be distinguished from a "bareboat charter," where a vessel is rented out for a specified period or voyage and the charterer gets possession and control of the vessel. Cf. *The Steel Inventor*, 35 F. Supp. 986, 994 (D. Md.) ; *Dampskibsselskabet* v. *Oil Co.*, 310 U. S. 268, 278.

mont was then executed between petitioner and the British Ministry of War Transport. Thereafter the Vermont completed its voyage to the Red Sea as required under the charter, and petitioner was paid by the Commission for freight and certain other items.

The charter itself speaks plainly enough on the identity of the parties between whom it purports to be a contract. It says, in unmistakable language, that it is an agreement "between CALIFORNIA EASTERN LINE, Inc. Owners of the Steamship VERMONT * * * and BRITISH MINISTRY OF WAR TRANSPORT Charterers." [6] "In this, as in any other case of a written contract, those who are parties to and bound by it are to be ascertained by an inspection of the document, and its provisions are controlling in the absence of some positive rule of law or provision of statute requiring them to be disregarded." See *United States* v. *Algoma Lumber Co.*, 305 U. S. 415, 421–422; *Farm Security Administration* v. *Herren* (C. A. 8), 165 F. 2d 554, 562, certiorari denied, 333 U. S. 875.

Nowhere in the charter is there a permissible basis for injecting the Commission as a party to the contract in contradiction of this clear declaration. As a ground for a contrary inference respondent points to the charter provision that "This charter not to become effective until approved by the United States Maritime Commission," and to the signature of the charter, after it had been executed by petitioner and an official of the British Ministry, by a Commission official to show the Commission's approval. It is far from clear, however, that this approval was either required or given because the Commission was acting as a party to the contract; more compelling reasons too readily suggest themselves. Thus, the Shipping Act of 1916, as amended, in sections 9 and 37 (46 U. S. C. secs. 808, 835) required approval of the Commission to charter of an American vessel to "any person not a citizen of the United States"; the Commission was aware of and considered this legal prerequisite in giving its approval. This may not only explain, in part at least, the charter requirement of approval, but tends to establish that the Commission did not consider itself as the charterer, or else its approval under that statute would have been unnecessary. If, moreover, the Commission had been a party to the charter, it would have been required by statute to insert an express condition that no member of or delegate to Congress would share in any profits or benefits thereunder (41 U. S. C. sec. 22). Presumably the Commission was aware of this statutory requirement, and its failure to comply with it tends further to indicate that its approval

[6] Compare the totally different provisions, where the Commission was a party to the charter, in *United States Lines Co.* v. *United States* (S. D. N. Y.), 52 F. Supp. 758, 760, n. 1.

was required for some reason other than that it was a party to the contract. Such a reason is suggested in the Commission's role as the agency for mobilizing the country's shipping resources and for carrying out and supervising the ocean transportation phase of the Lend-Lease program. The requirement of approval may well have been primarily a control device by which the Commission could assure itself that its functions were being properly executed, that the purposes for which the shipping was furnished were satisfied, and that all this was done in the most effective and economical way possible at the time. In any event, at the very minimum the meaning of the charter requirement of approval is so equivocal that we cannot assign it any force in overcoming the explicit statement in charter as to the identity of the contracting parties.

On a reading of the charter according to its terms, only one basic contention is advanced by respondent in support of the position that the contract was made with the Commission. That contention is that the contract does not express the true situation in this respect because the British Ministry of War Transport acted as the Commission's agent in entering into the charter, and the resulting contract therefore was actually with the Commission and not the British Ministry. Assuming that respondent may go behind the contract in this fashion, we find, on the evidence, an indispensable element of this position to be lacking. The Commission cannot be treated as the charterer in place of the Ministry at least in the absence of an intent on the Commission's part, at the time the charter was entered into, to be a contracting party and to have the Ministry act as its agent. On the basis of all the evidence, we have concluded that the Commission did not have that intent.

First, within the same period that the Vermont charter was negotiated and executed, the Commission owned freighters which it desired to place in service to Red Sea ports. The Commission did not, however, itself undertake to operate those vessels in that service, but leased them on bareboat [7] charter to two steamship companies as operators, and the latter in turn entered into space charters respecting those ships with the British Ministry of War Transport, which acted for the British Government. The Commission clearly was not the charterer in these contracts between the operators and the Ministry of War Transport; otherwise the leasing of the ships to the operators by the Commission would seem to have been an incomprehensible act of futility. Yet the space charters executed between the operators and the British Ministry for the Commission-owned vessels were, except for names and some slight modifications, identical with

[7] See note 5, *supra,* as to the nature of a bareboat charter.

the space charter for the Vermont executed between petitioner and the British Ministry. Those space charters of the Commission-owned vessels were, moreover, also drafted by Commission officials; were submitted in proposed form to the Commission for its approval; and provided that they were not to become effective until approved by the Commission. Comparison of the Vermont charter with the charters of the Commission-owned vessels by the operators to the Ministry, and of the circumstances surrounding execution of these charters, seems to us to give rise to the valid inference that the Commission was no more a party to the Vermont charter than it was to the charter of its own vessels by the operators to the Ministry; that the Commission no more intended to be a party to the former charter than to the latter; and that the Ministry was no more an agent of the Commission in executing the former than the latter.

Secondly, when negotiations for the Vermont charter were carried on, when agreement was reached on the terms of the charter subject to the Commission's approval, and when that approval was given, the evidence shows that it was the Commission's understanding that it did not have the power to enter into a charter for the hire of ships.[8] On March 19, 1941, a bill had been introduced in Congress to confer such power on the Commission, and that bill had been referred to the Committee on Merchant Marine and Fisheries of the House of Representatives. See H. R. 4088, 77th Cong., 1st Sess., 87 Cong. Rec. 2387. While the bill was being considered by the Committee, and in response to a request of the Committee chairman, Admiral Land, then Chairman of the Commission, wrote to the committee to express the Commission's views. Admiral Land stated: "The bill would authorize the Maritime Commission, until July 1, 1942, to charter and purchase vessels, whether of United States or foreign documentation. * * * Under existing law, the Commission is not authorized to procure vessels by charter." This letter was included verbatim in the committee's report recommending enactment of the measure (H. Rept. No. 440, 77th Cong., 1st Sess., at 9), and the proposal, conferring power so declared to be lacking, was thereafter adopted on June 6, 1941. Public Law 101, section 3 (a), 77th Cong., 1st Sess., 55 Stat. 242, 243, 50 U. S. C. App. sec. 1273.[9]

---

[8] Respondent's contention, that there was a principal-agent relation between the Commission and the Ministry, raises questions not only as to the Commission's authority to hire vessels but also, if such authority existed, as to the Commission's power to exercise that authority through an agent which was a totally separate body and one belonging to a foreign government. These questions need not be treated, however, in view of the evidence that the Commission did not consider itself as having the authority in the first place.

[9] Public Law 101 enacted H. R. 4466, 77th Cong., 1st sess., which resulted from a combination of H. R. 4088, of which mention has been made, and H. J. Res. 167, also introduced in 77th Cong., 1st sess. Section 3 (a) of Public Law 101, dealing with authority to charter, was taken from H. R. 4088.

It is difficult to believe that an agency which regards itself as "not authorized to procure vessels by charter," and which asks Congress for legislation conferring such authority on it, would at the same time intend to act in a manner which requires the exercise of that very power.[10] Even if the Vermont charter had been made after enactment of this statute bestowing power to charter vessels, it still would seem not to have been authorized by that statute, since it was a space charter whereas the statute only conferred authority on the Commission "to charter any vessel  *  *  *  on a time-charter or bare-boat basis  *  *  *."

Thirdly, in all the evidence contemporaneous with the negotiation, execution, and performance of the charter, there is not, with one doubtful exception,[11] a single reference to the Commission as a party to the contract or as charterer, undisclosed or otherwise, of the Vermont. Coupled with this absence of explicit recognition concerning the Commission, there is in marked contrast frequent reference to the British Ministry of War Transport as charterer in correspondence and memoranda of Commission officials, in correspondence of the Chairman of the Commission, and in minutes of meetings of the Commission. Thus this evidence speaks of "charters which were entered into by various steamship owners with the British Ministry of War Transport"; the "charter to the British Ministry of War Transport"; "the charter of privately-owned American flag vessels to the British Ministry of War Transport." The very resolution of the Commission approving the form of charter stated that it was "for use by private owners of American-flag vessels in chartering their vessels to the Brit-

---

[10] Respondent suggests that power in the Commission to charter the Vermont, under section 902 of the Merchant Marine Act of 1936 (46 U. S. C., sec 1242), came into effect as a result of the Presidential proclamation of emergency of May 27, 1941 (55 Stat. 1647), which antedated the sailing of the Vermont from New York and of the signature of the charter. Even if it be assumed that this Act conferred such power in these circumstances, there is not the slightest indication in the evidence that the Commission's negotiations were carried on or concluded in anticipation of such power coming into operation. Moreover, as to the actual importance of the proclamation, it is to be noted that Congress nevertheless enacted Public Law 101, which became effective on June 6, 1941. See note 7, *supra*.

[11] In one instance, during the negotiations on the terms of the proposed charter, a ship company official in arguing for a particular arbitration clause designed apparently to settle disputes through some medium other than the Commission, wrote in a communication dated May 13, 1941, that the "Maritime Commission will be a party directly or indirectly to the transaction." He seemed, in this, to be alluding to the Commission's part in arranging and negotiating the charter. If he meant any more, it became clear in later correspondence that he was speaking too broadly; the reply to that communication by a Commission official showed that the understanding between them was that an arm of the British Government was expected to be the charterer, the Commission official referring to the "Charterer, who proposed to be British Ministry of Shipping." The same thought appears in the letter of another Commission official written shortly thereafter to the representatives of another ship company, the latter stating that "We have confirmed that the British Ministry of War Transport may be the charterer. However, we are unable to state today that this will be so inasmuch as there are certain details yet to be discussed by us with the British Ministry of War Transport." During the succeeding days it became completely settled that the British Ministry of War Transport was the charterer.

ish Ministry of War Transport, under arrangements heretofore made in cooperation with the Commission or which may hereafter be so made." The same recognition of the Ministry as the charterer, with elaboration of the Commission's role of "cooperation", is found in a letter by Admiral Land to Congressman Edward J. Hart, a member of the House Committee on Merchant Marine and Fisheries and chairman of its sub-committee investigating charter rates paid for voyages in the Red Sea operation: "In obtaining the use of ships on a voluntary basis [rather than requisitioning them], the Commission undertook to correlate and direct traffic. Charters were made between the shippers and the owners. The Maritime Commission organized the schedules, spotted the cargo and loading berths, and approved the charter rates. Its control was exercised by indirection. In the case of the Red Sea voyages, the ships were chartered by their owners to the British Ministry of War Transport. The charter hire was paid out of lend-lease funds allocated for the purpose, presumably on account of the problem of exchange involved."

To establish that the Commission was the charterer and that the British Ministry acted only as its agent, respondent offered two exhibits in evidence: (1) Exhibit G—a certificate executed by an Assistant Secretary of the British Ministry of Transport, together with an unsigned statement attached thereto, the certificate asserting that the statement was "based on information extracted from documents preserved in the archives of the Ministry of Transport (formerly Ministry of War Transport)"; and (2) Exhibit H—correspondence in which the Department of Justice sought "an official statement from the British Government concerning its view as to the relationship between the United States Government and the British Government at the time the charters were executed," together with other correspondence which accompanied transmittal of the material in Exhibit G furnished in response to this request. Petitioner objected to the competence of these exhibits.[12] We have concluded that petitioner's objections should be sustained as to Exhibit G, and, since Exhibit H merely qualifies Exhibit G and falls with it, we have accordingly ruled that both of these exhibits are inadmissible. Exhibit G is not an "official statement from the British Government" as to any of the facts which respondent wishes us to take into account. The evidence upon which respondent relies is the statement appended to the certificate. Nowhere in the certificate of the Assistant Secretary of the Ministry of Transport is there any representation that the attached document represents

---

[12] The relevance of these exhibits might also be questioned if it were concluded that the Commission had no power to act through an agent like the British Ministry, and that any attempt to act in this way could not produce a contract with the Commission. These are matters which need not be considered (see note 8, *supra*), and we therefore assume these documents to be relevant.

the official views of the British Government; he certifies merely that the statement is "based on information extracted from documents preserved in the archives of the Ministry of Transport," and that to the best of his knowledge and belief it is a true statement. The statement itself does not appear to be an official record, nor is it an official statement of the views of the British Government. It merely incorporates information said to be collected by some unidentified person, and said to have been "extracted" from unidentified and undescribed documents. There are here none of the safeguards in the presence of which the hazards of hearsay evidence and of the absence of cross-examination are risked. Contrary to respondent's contention, Exhibit G does not satisfy the conditions under which official statements are admitted in exception to the hearsay rule. Cf. *Gilbert* v. *Gulf Oil Corp.* (C. A. 4), 175 F. 2d 705, 710; *United States* v. *Grayson* (C. A. 2), 166 F. 2d 863, 868–869; *Franklin* v. *Skelly Oil Co.* (C. A. 10), 141 F. 2d 568, 572; *Von Zedtwitz* v. *Sutherland* (C. A. D. C.), 26 F. 2d 525, 526; *Guettler* v. *Alfsen* (C. A. D. C.), 289 F. 613, 614. We point out, furthermore, that even if Exhibits G and H were admitted, they would not, taken together with all the other evidence, cause us to change any of our conclusions as to the facts as we have found them. Even in the presence of these exhibits, which reflect at best only the "view" or "understanding" of certain unidentified persons, the evidence in its entirety establishes to our satisfaction that in fact the British Ministry neither acted nor was intended by the Commission to act as the Commission's agent in entering into the Vermont charter, and that the charter was not with the Commission.

Respondent's contention, that the British Ministry acted as the Commission's agent and that the Commission was the charterer of the Vermont, is based on the facts that the Commission negotiated the terms and form of the charter, exercised supervision over performance under the charter, and, in behalf of the United States Government, furnished the funds and controlled payment under the charter. We think it does not necessarily follow, under the Renegotiation Act, that these circumstances stamped the charter as being a contract with the Commission.[13] The question of fact remained whether on the en-

---

[13] Little help is provided on the instant issue by the statutory history of the Renegotiation Act. It is interesting to note in this connection, however, the opinion on another situation of some members of Congress. After the Lend-Lease program was put into effect, certain contracts between American manufacturers and foreign governments, placing large orders for war equipment, were taken over by the United States at the prices fixed in those contracts. Most of the articles covered by the contracts had not yet been produced at the time they were taken over. Production of these items was then supervised by the United States; the goods were paid for by the United States with Lend-Lease funds; and the United States distributed the equipment to the armed forces of foreign governments. One of the agencies acting for the United States in this matter was the War Department, which was one of the "departments" named in the Renegotiation Act. These contracts were not considered to be within that Act. H. Rept. No. 733, 78th Cong., 1st Sess., 25–26 (report on renegotiation of war contracts by House Committee On Naval

tire evidence the charter was such a contract. As the repository of these very important powers, the Commission might have chosen in some circumstances to charter the Vermont itself, making all other arrangements substantially the same as it did here, and to undertake transportation of the British cargo to the destinations at which it was required. Whatever the reasons may have been, whether because of lack of authority or because of restrictions on its action which exigencies of the international situation then imposed on the United States as a non-belligerent, the fact is that the Commission avoided selection of this course. It chose rather that in which the British Ministry was the charterer and in which the contract was with the British Ministry; to itself the Commission relegated the function of making the arrangement and tending to other matters in a way which would make it possible for the British Ministry to charter the Vermont. The contract in fact was, and was intended to be, with the British Ministry and not with the Commission. Cf. *Waterman S. S. Corporation* v. *Land* (C. A. D. C.), 151 F. 2d 292, 293–296, reversed on other grounds, sub. nom. *Macauley* v. *Waterman S. S. Corp.*, 327 U. S. 540; *Alabama* v. *King & Boozer*, 314 U. S. 1, 13; *United States* v. *Algoma Lumber Co.*, *supra; Farm Security Administration* v. *Herren, supra.*

In finding for petitioner, it is unnecessary to pass on its contention that the burden of proof in this matter was on respondent. Assuming the burden to be on petitioner, we think that burden was met.

We have reached the result herein with reluctance, since the basic policy underlying the Renegotiation Act would seem to call for the renegotiation of this contract, but we have been unable to conclude that this contract is covered by the statute.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

Affairs, made pursuant to House resolution directing investigation of war effort) ; 90 Cong. Rec. 1357 (1944) (statement by Congressman Ed. V. Izac, member of House Committee On Naval Affairs, in debate on the amendments to the Renegotiation Act made by the Revenue Act of 1943).

Similarly, although administrative pronouncements do not dispose of the issue before us, they seem to place emphasis on the parties who *entered into* the contract, while apparently not regarding possession of certain powers as conclusive. The Joint Renegotiation Manual, issued under the 1942 Act by the "departments" concerned and given approval by the Maritime Commission, stated (at par. 323.3) : "All so-called lend-lease contracts entered into by any of the departments having renegotiation authority are subject to the provisions of the Act. However, lend-lease contracts entered into by any other department or agency of the Government are not subject to renegotiation under existing law." The Renegotiation Regulations For Fiscal Years Ending After June 30, 1943 (issued under the Renegotiation Act) provide (at par. 332.10) in dealing with "Contracts Involving Named Departments and Departments or Agencies other than Named Departments" : "As a general rule, the renegotiability of such contracts depends upon whether the contract is with a named Department and not upon whether a named Department receives delivery of, or pays for, the articles purchased."

TURNER, *J.*, dissenting: I have studied and considered what is said in the opinion of the Court in explanation of its conclusion that the United States was not a party to the charter contract herein. But when all is said and the theorizing is ended, the facts as I read them still show, regardless of the formalities indulged in, that it was the United States, rather than Great Britain, which contracted with the ship owners. The British Government asked the United States to furnish to it a substantial amount of much needed merchant cargo space and the United States, through its Maritime Commission, contracted for and delivered the merchant shipping requested. It is, of course, true that the paper record took the form of space charter contracts directly between various ship owners and the British Government, but I do not believe that even the petitioner, and others likewise resisting renegotiation of similar contracts, could with straight face and countenance seriously contend that the consideration flowing to them under the contracts in question was not the obligation of the United States, rather than that of Great Britain. Certainly, as I understand the evidence, that was the position taken by the British Government when it was asked to sign the charter contracts. It accepted the form taken by the contracts only when it was assured that it would not be so obligated, and it was only after receiving assurances to that effect that its Ministry of War Transport signed the papers in question.

It is true that the charter fees were to be paid from moneys appropriated by the Congress of the United States, under its so-called Lend-Lease legislation, and under that legislation accounts were kept which on their face pictured the expenditures as loans and indicating an obligation on the part of Great Britain to make repayment thereof at some indefinite time in the future. That such, however, was not the commonly accepted meaning and intent of the legislation, is too well known to require discussion. The common understanding based on the public utterances of the President, other Government officials and Members of Congress was that such portions of Lend-Lease funds as might be regarded as having been directly expended and consumed in the prosecution of the war were to be regarded as having been spent by this Government as its contribution thereto and that countries receiving the benefit in their fighting of the war of such expenditures would never be called on to account for or repay such moneys. That such was the purpose and intent of the Lend-Lease legislation is corroborated, as shown by evidence in the record in this case, by what was done when the representatives of the United States and the British Government sat down together after the end of hostilities to balance their accounts. The attitude taken by the British Government at the time it was requested to sign the charter contract herein was accepted and it was agreed that the moneys so paid out by the United

1344

States were moneys paid by it in pursuance of its participation in the war.

The Court has not, in my opinion, squarely faced and dealt with the purposes and results of the Lend-Lease legislation as it bears upon and affects transactions of the kind involved herein. But rather, it allows itself to be drawn into a consideration and discussion of a question of agency, which, in my opinion, might never be reached if a more realistic approach is made to the question before us.